May it please the court, Davina Chen on behalf of Michael Kalantari. I hope to reserve three minutes for rebuttal and I will watch my clock. Yugo Karin was the instigator of the criminal conduct at issue in this case. After a former crime partner who turned out to be actually cooperating with the government brought him a purported opportunity to sell expensive HIV medications, Mr. Karin reached out to a pharmacist he knew, Irina Sadovsky. Ms. Sadovsky in turn introduced Mr. Karin to Mr. Kalantari who she knew because he and his wife ran a medical concierge service providing mobile medical services to group living facilities. Both Mr. Sadovsky and Ms. Sadovsky and Mr. Kalantari defended on the ground that they understood Mr. Karin to actually be seeking services for the many residents of Seoul Transitional Housing. Mr. Kalantari and Ms. Sadovsky were tried separately and Mr. Karin was the key witness in both trials. Ms. Sadovsky was acquitted of three of the five counts of which Mr. Kalantari was involved and this court has vacated her remaining convictions on unrelated jury coercion. I hate to interrupt the soliloquy here but I want to get right to a point. How can you view Karin's testimony at Ms. Sadovsky's trial as being true and his testimony at your client's trial as false for purposes of the NAPU evaluation? Well, getting right to the point, the first two categories of the false statement are clearly true at Ms. Sadovsky's trial and false at Mr. Kalantari's trial. And what portion of that testimony to what do you refer when you just say that? Well, so the first was that the question at Mr. Kalantari's were you telling people that you had 500 patients in your facilities? There was a recording played at Ms. Sadovsky's trial in which he was telling people that he had 500 people in his facilities. One of the recordings was the recording with Ms. Sadovsky and her manager. He also discussed at Ms. Sadovsky's trial and that was a recording with the undercover agent Gary where he explained to Gary that he had 500 patients or I think it's 400 and some patients and 500 on a waiting list. So there is no way to conceive that that statement at Ms. Sadovsky's trial was false because it was corroborated by the recordings. Wasn't Mr. Caron cross-examined about that at Mr. Kalantari's trial? He was cross-examined about that. And so why doesn't that, I mean I think for the whole laundry list of things that you point to, we certainly have discrepancies and I think you're probably right that some of them you can demonstrate which which is true and which is not. I don't think you can do that for all of them. But the jury had before it the credibility test for whether that was true or not in the comparison of the different statements that were being made. And so why doesn't that solve this problem? It doesn't solve this problem because it's the government's obligation to correct their witnesses' false testimony. This court and the Supreme Court have been absolutely clear that the NAPIU issue is not that the false testimony was given. It's that the government failed to correct it because a mid-trial correction from the government is fundamentally different from cross-examination. In this particular case, the cross-examination didn't really land. It partially didn't land because it was generally preceded by a series of objections. So Mr. Johnson asked Mr. Caron, you know, isn't it true that you said this? And the answer was no. And then Mr. Johnson attempted to impeach and the government said that it would be hearsay. It would be hearsay for Mr. Caron to say what he had told others. So it was interfered by a series of objections. But more importantly, the loop was never closed. As this court held in Dickey v. Davis and Clements v. Page, the Clements v. Maddox, the important fact is that the witness is lying on the stand. The important facts may not, in this case, the important facts also went to the defense. But the more important fact is not just that the witness is unreliable and that he gives inconsistent statements at one trial and another, but that this witness is lying under oath on the stand in this case. And that is what Glossop held very clearly. So then let's push back on, like, how can you tell which version is true and which version is not true? With respect to the first category, there's no, there's no evidence. There was a recording of Mr. Caron. He could have been lying in the recording. I don't understand why we're giving more weight to the recording. No, no, no. The question is this. The question that Mr. Johnson asked was, and weren't you telling people that you had 500 patients? Because the recording shows he had said that. Right. So he was telling people. Right? That was the question. The question was, weren't you telling? Because he was telling my client that. Right? So let's bring this back to what is the point of the defense? My client believed that he had 500 patients. That's why he wanted to be in this deal. While I was listening to the other arguments, I looked at 2 ER 334, which is Mr. Caron testifying at Mr. Kalantari's trial, that as late as March of 2017, so after all of the pharma and the prescriptions were filled, et cetera, Mr. Caron was still sending text messages to Mr. Caron saying, when are we going to get started? I have an overseas trip. I still have several days of work that I need to complete. If my client thought that his job was just to write prescriptions that were not going to be filled, his job would have been completed in January because the prescriptions were all filled in January. But in March, my client is still asking, when are we going to get started? I have several days of work. So let's be clear as to what the discrepancy is about. My client thought that there were 500 patients. And whether or not Mr. Caron had been telling people that there were 500 patients is crucial to my client's state of mind. And that is his whole defense. Likewise, with Mr. Caron's testimony at Mr. Kalantari's about what a medical concierge is, we know for a fact that's not true because five weeks earlier he had testified at a trial and discussed in detail what a medical concierge was. And again, there were recordings played of him talking about how he would bring a medical concierge to Seoul Housing because that would be easier than bringing 500 patients to doctors. So when he says, I don't know this concept of medical concierge, that is false. So with respect to the first two categories, they are indisputably false at the second trial and true at the first trial. I will concede with respect to the third and fourth categories, not quite as clear. The third category is he testified affirmatively, voluntarily. Mr. Kalantari always wanted to see the file because he wanted to make sure the patients were real. Now, you can see why Mr. Kalantari might be a little bit suspicious. He understands, you know, you can look on the internet that Mr. Caron runs this gigantic organization called Seoul Housing. But Mr. Caron is kind of weird. Like he wants to meet at like Starbuckses and bakeries. So you can understand why my client, before he got his wife and his wife's doctor involved in a medical concierge business with Seoul Housing, would want to know if the patients were real. Okay. At the second trial, when he was asked, and isn't it true that Mr. Kalantari asked to see the patient's file because he wanted to see that they were real, Mr. Caron said no. So again, it's a direct conflict from the first one. Do we know which one is true? Not necessarily. But given the state of affairs, it's more likely that the testimony in Mrs. Sidofsky's trial was true. And then... Can we switch gears? I mean, we're going to run out of time and you've got a number of issues here. I would like to switch gears to the jury instruction question. Okay. Did you object to the jury instruction? I wasn't trial counsel. The trial counsel did object to the jury instruction, not quite on the same grounds that I raised on appeal. But he did object to the jury instruction. So originally the judge had written one set of jury instructions. So I was trying to go back into the district court record and find the actual jury instruction. I mean, we have the transcript of what the judge said. But I didn't find it in the docket sheet. Where is it? In this particular case, the court did not file the given jury instruction. So what we have to look at is volume one, the oral instruction on the page. All right. So then your argument is that an objection was made so we don't review this for plain error and why? Or do you think we do review this? Your argument about knowledge. I believe that an objection was made because originally the court had one objection, one version, and the government objected and said, no, I'd like the version to be, I'd like you to add these things. And when the court added those things, defense counsel objected and said you'd wear the record. Give me the record, sorry. I have one ER 32 to 40. I believe that Mr. Kelantar objected to the wording of the instruction which the district revised at the government's request. This is a slightly varying question. Why was it error for the district court to give a 404B limiting instruction that aligns with the pattern instructions? Isn't that an accurate statement of the law? No, it wasn't an accurate statement of the law for a number of reasons. First, it didn't fully align with the pattern instruction. The pattern instruction specifically requires that the jury be instructed that they have to first find that the other acts actually happened and that particular line was omitted from this instruction. Second, isn't a 404B instruction, so clearly it needs to be tailored to the actual evidence that is being limited, both what is the evidence and what is the purpose. We can't give a standard 404B instruction listing all of the permissible inferences in every case because, as this court has made very clear, you have to identify what is the inference that can properly be drawn without a propensity chain of logic. It was kind of the standard instruction, but the standard instruction itself requires choices to be made and those choices were not properly made in this case. So, from your perspective, it wasn't a standard instruction in the first place. It had to fit into the pattern of this case and it didn't, so what I just asked you is not of any value from your perspective. From my perspective, the pattern instruction requires the district court to make choices and, in this case, the choices that the district court made were improper. The first choice that the district court made that was improper was exactly what defense counsel objected to, characterizing these statements as acts. So, these statements, these recordings were admitted because the court had ruled pre-trial in limine that they could go to, the fact that he made these statements could go to absence of mistake. And I agree that that would be a permissible inference to draw if you're talking about certain crimes, then it's possible that you hadn't made a mistake. But what the, the instruction that the court actually gave described not statements but acts. You know, you can consider these other acts for this reason. He's not on trial for these acts. The fact that he may have committed these acts is evidence of etc. But the statements were not acts. The statements were discussions of acts and Mr. Kalantari's defense was that he never intended to do any of those things. In fact, he said things like, oh, I have 900 Norcos. If he intended to, he didn't have 900 Norcos, but if he intended to sell 900 Norcos, he would have. No one even gave him the opportunity to act on any of the things he claimed he could do. And that is because he could not do any of those things. He himself was playing a role. He was playing a role at this time because this is October or November of 2017. All of the conduct in this case occurred in January through March. And in July, Ms. Sadovsky's pharmacy got raided. And he came to understand that perhaps he had been dragged into something that he should not have been dragged into. And he went to these meetings with Mr. Karan, attempting to understand what this conduct was. So he goes and he lies. He says, oh, I can do it again. Let's do it again. I have 900 Norcos I can sell right now. I have patients. I have pharmacists. He doesn't have any of these things. He's just saying this. But the instruction that the court gave left the jury with the impression that he could do those things, that he had done those things, and it would be permissible to draw the inference from his discussion of these things that he had all of these purpose, intent, that he acted with a pattern, et cetera. I see that I'm on my yellow light already. So before you run out of time, I want to circle back to I was asking about the mens rea instruction, and you gave me a citation for where you think in the record it shows that an objection to that was preserved. Was that correct? Was that citation that you gave? The knowledge instruction? Oh, I'm sorry. I gave a completely wrong instruction. No, it's on plain error. Okay. Yes, that's on plain error review. No objection. I am going to reserve the remainder of my time for rebuttal. That's fine. Good morning, Your Honors. May it please the court, Paul Crane on behalf of the United States. I'm happy to start with any of the issues the court would prefer. I can begin with Nipu unless you would prefer otherwise. Would you start with the mens rea instruction? Yes, Your Honor. When I read that instruction, it is missing an element. That's a big deal, missing an element. I mean, there's all kinds of instructional errors you can have, but missing an element is a really big deal. So how is that not plain error? Well, I don't think it's plain error, Your Honor, because when you view it in the larger context of this being a conspiracy charge as opposed to a substantive count charge, I don't think I would disagree with you if it was just simply the substantive count charge, that there would be an erroneous description of the 331333 type of unlicensed wholesale offense. But if you go back a page and the court is talking about in order to find the defendant guilty of conspiracy, which is the count charge, this is on 3ER664, the court specifically says that one of the elements of conspiracy is that the defendant became a member of the conspiracy, quote, knowing of its object and intending to help accomplish it. And so I think when you view it in that larger context there, especially on a plain error review, that there's no real risk that the jury was finding Kalantari guilty on count five without having some sort of knowledge element. Give me that site again. 3ER what? 3ER664. And that is the beginning of the jury instructions for count five. And then the next two pages later at 3ER666 is the description of here are what the elements of the crime for unlicensed wholesale distribution is. Right. And it never ties that you need to know that there's an unlicensed – it says you need to know there's a wholesale distribution. It does not say that you need to know it's unlicensed. I don't disagree, Your Honor, that taken in isolation and in a vacuum, that description needs improvement. There wasn't an objection. Does that mean it's wrong? I think in the larger context – I don't really want to resist too hard that that is not the most accurate statement of the law. But I want to resist your resisting. I really want to know what is the government's position because if we're missing something, I'd like to hear it. Now would be the time. I think the instruction's error. Do you? Well, I think that is an incomplete description of the elements of the crime of unlicensed wholesale distribution. All right. Thank you. And what is the impact of that on this case? I don't think there is any plain error. I think there is – when you view the instruction in larger context, both that this was a conspiracy count, not the substantive count, and the discussion of knowledge both sort of before and after that problematic aspect, there's not a clear or obvious error in describing to the jury what it needed to find to do a conviction on count five. Even if the court were to find a prong two problem, there is no prong three or prong four problem. There was no sort of risk that the jury on the evidence that was submitted would have thought, oh, Kalantari did not – thought there was a license for wholesale distribution. Everything in the evidence – that wasn't the theory of defense, and everything that was put into evidence was consistent with needing to sell on the black market. And if you watch the videos, Kalantari is clearly talking from a place of this is unlicensed wholesale distribution on the black market. So even if there were a prong two – From your perspective, this doesn't change the result. That's correct, Your Honor. We do not think there's a clear or obvious error, and even if you were to disagree with us on that, we do not think there is a prong three or prong four problem on plain error. So either way, we think you should affirm the count five conviction. Can you address the Napook arguments? Yes, Your Honor. So I would reiterate that that's also a claim on plain error. I don't think if you look at the different categories of information for a lot of the reasons that Your Honors were discussing with my friend on the other side, there isn't a clear or obvious falsehood. I think there are certainly inconsistencies, and I think there are some statements that Karen said that probably weren't true, but all –  Doesn't that have to be untrue, the concierge statement? I think so, Your Honor, but that was also immediately cleaned up. I mean, all these statements were made during the cross-examination by Kalantari's counsel, and the statements that are in the first, second, and third categories of claims were almost all immediately successfully impeached by Kalantari's counsel, including the medical concierge claim. So the way I read the transcript is Karen was sort of almost being kind of hostile and then was immediately called out on it and said, yep, that's right, I did in a prior proceeding say that, and even later on in the cross-examination is talking about medical concierge. So I agree that that sentence was probably a falsehood, but it was almost immediately taken care of by Kalantari's counsel. Similarly, there was discussion about the talking about, in the community, 500 either patients or guests. That's one of the aspects of the first category of claims. That also was successfully impeached by Kalantari's trial counsel on cross-examination. The transcript cite for that is 3 ER 474. So all of the categories of claims, I don't think, after sort of the ability to account for the further cross-examination, that there was any clear or obvious falsehood. There also, I don't think, is an establishment of the second or third prongs for a NMPU claim, which I'm happy to rest on our briefing unless the court has questions about that. I do not. I do not. Can you adjust the minor role adjustment? Yes, Your Honor. So as I understand, my friend on the other side, there's sort of two aspects of the minor role adjustment. There's the inadequate explanation claim, and then the actual merits of the minor role adjustment claim. I think on the inadequate explanation, that wasn't raised during sentencing, so I think that aspect is reviewed for plain error, and I don't think it's either clear or obvious that there was inadequate explanation, and regardless. Why is that? Because there is no explanation. I mean, so I think it's clear, reading between the lines, that the district court understands what he's supposed to be doing there, which is sort of weighing the relative culpability of everybody involved in this scenario, but his conclusion, he gives no statement for why he concludes that this person is not entitled to a minor role adjustment, and that might be a perfectly valid conclusion, but we don't know why he got there. I agree, Your Honor, that the trial court during sentencing didn't specifically address it. I think what we're relying on is the PSR said he's an average participant, is not entitled to a reduction. And that might save it if he'd said, I'm just adopting the PSR on this issue. Did he? I think the court did say he was adopting the PSR, except for the loss, parts of the loss amount calculation. Can you give me that slide? I'll double check that. Yes, Your Honor. I can get your indulgence for a moment. That's 1ER-107-108. All right, so your argument is that that's enough of a record for us if the district court said, I adopt the PSR and the PSR addressed this. I think, absent an objection from the defendant, that yes, that is. Why does that make a difference? Well, I think if the defendant had made an objection of, I want to hear more of your explanation beyond that, depending on the context, if the district court was basically like, no, I'm not going to say anything, I don't want to say categorically simply saying adopt the PSR always insulates that. I'm just saying here, given that that wasn't something that the defendant asked for additional explanation about. I guess I'm not understanding that, because if the reference to adopting the PSR in sort of general terms, and again, I don't remember that, so I'll look at it in the record. If that's enough to say it's not error, then fine. We don't need an objection, whatever, it's just not error. But if it's not enough to say it's not error, then why does we need an objection? It's still just error, and it's pretty plain in our case law what you need to do. for why it is that you have rejected or reached your conclusion on this sort of relative culpability analysis. All I was trying to reserve, and I appreciate all that, Your Honor, is I could imagine a situation where the defendant makes some sort of objection or makes some sort of point that would merit a further discussion from the district court. So on the point of whether or not just sort of like the off switch, on-off switch, of whether or not the district court gave enough explanation, it really doesn't matter, it seems to me, what the nature of the defense objection was or wasn't or whatever. It was just did you comply with the legal obligation to explain your reason for why you reached this decision? Right, and I think I should probably just yield, but all I'm trying to say is in the absence of an objection, the district court saying I rely on the PSR I think is an adequate explanation. So let's set aside whether this was error or plain error or not. The rest of the plain error test, you think, even if we say this is error, it doesn't affect substantial rights and it doesn't undermine the credibility and integrity of the proceedings? Correct, Your Honor, because I think on the substance, the district court was correct to not afford Mr. Kalantari the four-point reduction or two-point reduction for minor or minimal role. We actually have a case law that says that if the district court says, my reasoning in this particular matter is set forth in the PSR, as long as the defendant doesn't object, isn't that adequate under our case law? Yes, Your Honor, I think that that is correct. And I think in that sort of plain error, and they kind of this is where some of the prongs almost kind of collapse on top of each other in a inadequate explanation context. And I think when you pair that with that there is substantively no error in declining to give the reduction, that just reinforces the lack of inadequate explanation claim. Your Honor, did you want me to address the substance of the minor participant, or was it mostly just the inadequate explanation? Well, I mean, I guess briefly because that's part of your argument for why even if we found error doesn't matter. Yes, Your Honor, so I think the PSR description of this was an average participant and this primarily three-person conspiracy is accurate. I think one of the best ways to know that is how the co-conspirators were planning to divide the black market proceeds themselves, which was one-third, one-third, one-third. To the extent the burden is on Kalantari to establish that he's entitled to a reduction, that he was entirely substantially less culpable, the evidence all points in the opposite direction of that. Judge Smith, do you have other questions? I do not. First floor? Give me a second. Sure, no problem. Thank you. Thank you for your argument. I'm happy to address any questions that the court has. If not, I have four areas that I would like to. Let me fill it down to this. This case, of course, relies hugely on evidentiary issues. If you had to pick your very best shot, what is it? My very best shot is that the government's entire case relied on Mr. Karen and Mr. Karen was a liar and the jury was not told that he was a liar. Isn't that, though, the problem to the jury to determine that? So in LaPage, which I didn't get to mention in my opening remarks, this court was very clear that when the government knows that its witness is lying, it has the obligation to fix that. Impeachment is not enough because, as this court stated in LaPage, the jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism. No lawyer may knowingly present lies to a jury and then sit idly by while opposing counsel struggles to contain the pollution of the trial. In LaPage, there was extensive cross-examination. And in the end, the government actually conceded in its rebuttal argument that its witness had lied. And this court, nevertheless, held that there was a NAPU error and reversed. And the lie to which you make reference is what? The first two are very clear lies. The first lie is, and you were telling people that you had 500 patients. I understand that earlier. You spoke to that early on, so I got that one from your perspective. What else? The second one is, I don't know this concept of medical concierge. And this goes to the heart of Mr. Kalantari's defense, which is that he was presenting medical concierge. The third one is that Mr. Kalantari did not ask to see the patient files because he cared that the patients were real. And the fourth, which I did not get to discuss before, but the government brought it up now, was this idea that they were going to split the proceeds one-third, one-third, one-third. This is particularly significant because 18 pages earlier in the transcript, Mr. Karen testified that Mr. Kalantari's job was done when he wrote the prescriptions and got $200. The sale was not his department. Eighteen pages later, the government returns and asks the question, and what was your understanding that he would get paid? And for the very first time in all of the proceedings, meaning the trial, the grand jury indictment, any of the previous interviews, Mr. Karen comes and says, we were going to split the proceeds one-third, one-third, one-third. The reason why I say this is so significant is because this is the one NAPU error that the government voluntarily elicited itself. Mr. Karen had never said such a thing before. In fact, the indictment lists Mr. Kalantari as someone who provides the prescriptions, not as someone who sells the drugs. So unlike the first three NAPU errors where the lie was elicited during cross-examination, and let's be clear why that happened, right? So there was a trial, Ms. Sadovsky's trial, and certain things that Mr. Karen said at Sadovsky's trial went directly to support Mr. Kalantari's defense. But when Mr. Kalantari attempted to elicit those same statements at his trial, Mr. Karen said no. And that's why the first three NAPU errors come during Mr. Karen's cross-examination. But the fourth NAPU error, the government elicited itself. And the government elicited – the question is nearly identical in Sadovsky's trial and Kalantari's trial. What was your understanding of what Mr. Kalantari would get paid for his – for the sale? And the answer is diametrically different. This is not a case that is – these convictions are not worthy of confidence. Mr. Kalantari's defense was solid. Ms. Sadovsky presented the same defense five weeks earlier and was acquitted of three of the five counts. This court should reverse. I see I'm over my time. If the court has any questions on the other issues with the government counsel, I'm happy to answer it. And I will not argue it because the government did not touch it, but I really hope that the court will look at – take a very close look at loss. To me, it is a very clear legal error to count the drugs twice. Counsel, you are over time, as you acknowledged. Judge Smith, any additional questions?  Ms. Forrest, I think we don't have any other questions. We appreciate your argument very much. And with that, the public portion of this appeal is concluded. The panel has questions for the government regarding SEPA issues. That will take place ex parte. A recording of that proceeding will be maintained. We'll be off record. All rise. This court for this session stands adjourned.
judges: SMITH, CHRISTEN, FORREST